O’NIELL, Chief Justice
 

 (dissenting).
 

 The first and most important question in this case, of course, is whether the court should abide by, or should now reverse, the rule of property which the court, in 1931, deliberately, definitely, and finally declared to be established and settled, in the case entitled State of Louisiana et al. v. Mason P. Erwin et al., 173 La. 507, 138 So. 84. That decision, and the several decisions on which it was founded, have put a very definite construction upon articles 450 and 453, and articles 509 and 510, of the Civil Code. It is not said or suggested in the prevailing opinion in this case that the court was guilty of any inadvertence, or overlooked any proposition of law or question of fact in the Erwin Case. There is nothing new in the argument or brief for the State in this case, not anything that the court did not have the benefit of in the Erwin Case. No reason is given to support the majority opinion in this case that was not given in the dissenting opinion in the Erwin Case. The judge of the district court, in the written reasons which he gave in this case, for declining to follow the decision which this court rendered in the Erwin Case, does not claim any originality, or advance any reason or suggestion that was not advanced in the briefs of the Attorney General, or in the briefs of the attorneys for the Louisiana Land & Exploration Company, as coplaintiff, in the Erwin Case. In that case the court had the benefit of the arguments and briefs of many of the most prominent lawyers in Louisiana, and' elsewhere, representing the several oil companies claiming leases on the submerged area that was in dispute. The briefs filed in the case amounted to 490 printed pages. The then Governor of Louisiana, and the attorney for the Board of Levee Commissioners of the Orleans Levee District, filed briefs as amici curiae. The case received unusual attention because it was understood that the decision would settle for all time a rule of property of vast importance. The case was argued and submitted on the 7th day of January, 1931, and was under consideration by the court nearly three months. The decision, affirming the judgment of the district court, was handed down on the 30th of March; a rehearing was granted on the 17th of July; the case was argued again on the 3d of November, and the final decree, reinstating the original opinion and decree, was handed down on the 30th day of November, 1931. The elapsed time, therefore, from the original argument of the case until the final decision was nearly ten months. The decision in the present case was handed, down on the twentieth day after the case was argued. It is conceded that this case is, as far as the pertinent facts go, a replica of the -Erwin Case. It presents exactly the same issue that was tendered and decided in the Erwin Case, and is governed by the same law that governed the Erwin Case, so much so
 
 *823
 
 that the judgment which the judge of the district court has rendered in this case cannot be affirmed unless the decision in the Erwin Case is overruled. The State was one of the plaintiffs in the Erwin Case, the other plaintiff being a private corporation, styled Louisiana Land & Exploration Company, holding an oil and gas lease from the State. The defendants numbered thirty-eight, six of them being oil and gas companies,, one being the Union Sulphur Company, and others being the owners of lands bordering upon Calcasieu Lake. The attorneys who represent the plaintiff in this case represented the plaintiff, Louisiana Land & Exploration Company, in the Erwin Case, and have lost both cases. The only difference between the Erwin Case and this case is that in the Erwin Case the land in contest was under the edge of Calcasieu Lake, and in this case the land in contest is under the edge of Grand Lake. Both lakes are in Cameron parish, only a few miles apart. Grand Lake is more of an inland lake than Calcasieu Lake, because Grand Lake is about 27 miles from the Gulf, by river, and Calcasieu Lake is only 6 or 7 miles from the Gulf, by river. It is not intended by the decision in this casé, as I understand, to establish a rule of property to be applied only to the owners of lands on Grand Lake, and to leave standing the rule of property which this court applied to the owners of lands bordering upon Calcasieu Lake, in the Erwin Case. In fact the Erwin Case is pointblank overruled. The rule of property which was applied in that case, however, must stand, as far as the lands and the rights of the thirty-eight defendants in that suit, and the subsequent owners of their lands or their rights, are concerned, not because of the doctrine of stare decisis, or the settled rule of property, but because the rule of property which was applied to those defendants, and to their lands and their rights, is a thing adjudged. My opinion is that, when the State’s highest court has construed a statute of the State, and has thereby established a rule of' property, in a suit in which the State was one of the parties, and in which one of her land owners was an opposing party, the decision is final, and binding, not only so far as it concerns the parties to that suit, and the land which was in contest in that suit, but also in any subsequent suit in which the same question arises, between the State and another of her land owners, “similarly .situated.” The finality of the decision in such a case is as important as it is in a suit between the State and a taxpayer or bondholder, in which the constitutionality or legality of a tax, or of its dedication to the payment of a bond issue, is tested. The only difference between such a case and this case is that in the one case the established rule of property affects the title to bonds and in the other it affects the title to lands. But, conceding, for the sake of argument, that the doctrine of res judicata is not quite applicable in this case, I respectfully submit that, if the constitutional right of all men, similarly situated, to have the equal protection of the law, is not to be applied in a case like this, the constitutional guaranty in that respect, though it speak with the tongues of men and of angels, has become as sounding brass, or a tinkling cymbal.
 

 
 *825
 
 If the construction which this court gave to articles 450 and 453, and to articles 509 and 510, of the Civil Code, in the case of the State of Louisiana and the Louisiana Land & Exploration Company against Erwin and others, in 1931, and in the cases cited in the opinion rendered in that case, is a reasonable construction, as distinguished from one that is arbitrary or obviously wrong, the decision rendered-in the Erwin Case ought not to be overruled, merely because of a difference of opinion on the part of a majority of the members of the court, as now constituted. I propose, therefore, to show now, in consideration for the court as an institution, as it was composed in 1931, and' particularly for the member who wrote the majority opinion in the Erwin Case, and who has gone to his reward, that the construction which the court applied then to these articles of the Civil Code was not only a logical and reasonable construction, not palpably wrong, but was in fact the correct and literal construction of the law.
 

 Articles 450 and 453, and articles 509 and 510, of the Civil Code contain all of the statute law that the state invokes or relies upon as authority for the State to reclaim from an individual, or a private corporation, the title to land for which the State has issued a valid patent, and has collected the price. These four articles of the Code • are the same articles — -and the only articles — that the State invoked or relied upon in the Erwin Case.
 

 Articles 509 and 510 of the Civil Code state the law — and the only law — by which the owners of lands bordering upon navigable rivers, or running streams, may acquire or lose land titles, by effect of a change in the shore lines of the streams. It has been observed, consistently, by this court, -and is not expressly denied in the prevailing opinion rendered in this case, that articles 509 and 510 of the Civil Code do not affect the ownership of lands bordering upon lakes. The beds of non-navigable lakes, of course, belong to the individual landowners. The beds of the navigable lakes, within the shore lines as they were in 1812, when Louisiana became one of the United States, became the property of the State by virtue of her inherent sovereignty. The lands bordering upon the navigable lakes, when Louisiana was admitted into the Union,, either belonged to the holders of French or Spanish grants, or remained the property of the United States, and were afterwards granted to the State, for the most part, by the swampland grants of 1849 and 1850. (Act Cong. March 2, 1849, c. 87, 9 Stat. 352, and Act Cong. Sept. 28, 1850, c. 84, 9 Stat. 519 [see 43 U.S.C.A. §§ 982-984]). The shore lines, or meander lines, of the navigable lakes, as they were in 1812, being the boundary lines between the lands which the State acquired by virtue of her sovereignty, and the lands which she did not so acquire, were traversed by the United States Deputy Surveyors, and delineated on the government plats, about the time or soon after this territory became one of the sovereign states. As a matter of law, these boundary lines, between the land which the State acquired by virtue of her sovereignty and that which she did not so acquire, have remained unchanged by the physical changes
 
 *827
 
 which nature has wrought in the shore lines of the navigable lakes. It was so held in the following cases: State v. Bozeman, 156 La. 635, 101 So. 4; State v. Standard Oil Co., 164 La. 334, 335, 349, 113 So. 867; McGlothlin v. Shreveport, 160 La. 101, 106 So. 708; Ellerbe v. Grace, Register, 162 La. 846, 111 So. 185; State et al. v. Erwin et al., 173 La. 507, 138 So. 84, and State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145.
 

 The decision that is being rendered' in this case does not maintain that it is by virtue of articles 509 and 510 of the Civil Code that the State should regain title to that part of the plaintiffs land which has been encroached upon by the erosion of the lake shore. The decision here rests upon articles 450 and 453 of the Civil Code. The conclusions by the majority of the members of the court are summed up thus:
 

 “It is our opinion that the doctrine of stare decisis, as establishing a rule of property, is not applicable in the instant case, and that the case of State v. Erwin, supra, is erroneous and is hereby overruled. We are further of the opinion that the bed or bottom of Grand Lake, a navigable body of water, including the area in controversy, which has been submerged since 1883, [the year in which the State issued its patent for this land to the plaintiff’s author in title], belongs to the State of Louisiana, by virtue of its sovereignty, it being a public thing and insusceptible of private ownership under the provisions of articles 450 and 453. of the Revised Civil Code. Having reached the above conclusion, it is unnecessary to consider the applicability of articles 509 and 510 of the Revised Civil Code to this case.”
 

 It is my opinion that it is necessary in this case to consider articles 509 and 510 of the Civil Code. In the first place, the law which is expressed in articles 509 and 510, and the law which is expressed in articles 450 and 453, are laws in pari materia, and are so interrelated that they explain one another. In the second place, articles 450 and 453 do not operate as a transfer of title to land, or work a forfeiture of title, by the process of erosion. Hence, if the State has not reacquired title by virtue of articles 509 and 510 of the Civil Code, to the land in dispute, which the State sold to Watkins in 1883, the State has no title whatever to this land. Article 450 defines “things, which are common” as being the things which belong to nobody in particular, and which all men may use freely, for the purpose for which nature intended them, “such as air, running water, the sea and its shores.” The next article in the Code, article 451, defines the “seashore” thus: “Sea shore is that space of land, over which the waters of the sea spread in the highest water, during the winter season.” That does not mean or include the shore of an inland lake, or such land as is in contest in this suit. This is not land over which the waters of the sea spread, and from which they recede, alternately, according to the winds, or seasons of the year. The next article of the Code —article 452 — declares that, from the public use of the seashore, it follows that every one has a right to take shelter there, and for that purpose to build cabins, to land boats, to fish, to dry nets, and1 the like,
 
 *829
 
 provided no damage results therefrom to the buildings of the owner of the adjacent property. All of which has nothing to do with the question, whether the boundary lines between the beds of the inland navigable lakes, which the State acquired by virtue of her sovereignty, and the land which is owned by individuals, bordering upon the lakes, have remained fixed where they were when this territory became a state, or have shifted, with the changes which nature has made in the shore lines of the lakes. By Act No. 173 of 1914, p. 292, the Legislature added to article 452 of the Civil Code a proviso, declaring that, where a seashore is within the limits of a city or town, the seashore shall be subject to the police power of the city or town, as provided in its charter, and that no structures shall be built on such seashore or in the waters adjacent thereto except on such conditions as the city or town may prescribe. That statute was introduced by a representative from the parish of Orleans. It is very likely that he had in mind the fact that this court had referred to the shore on Lake Pontchartrain, in several instances, as “seashore.” Obviously, his object was to give to the municipal council control over “the public use of the seashore,” referred to by this court in those cases. All of which demonstrates that these articles of the Code, 450, 451, and 452, which allow “the public use of the seashores * * * conformably with the use for which nature has intended them,” have nothing whatever to do with the question of ownership of the land in contest in this case.
 

 . Article 453 of the Civil Code, on which article the prevailing opinion in this case is largely based, defines “public things,” thus:
 

 “Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water.
 

 “Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors.”
 

 In this article, 453, the redactors of the Code did not mention “lakes.” They mentioned navigable rivers, seaports, road-steads, and harbors, highways, and the beds of rivers “as long as the same are covered with water,” but not lakes. Their beds, as they were when this territory became a State, belong yet to the State, whether they have remained covered with water or have become dry, in whole or in part. Article 453 of the Revised Civil Code was article 444 of the Code of 1825, and was article 6 of chapter 1, title 1, book 2, of the so-called Code of 1808, entitled “Digest of the Civil Laws in Force in the Territory of Orleans.” The language used in both of the old codes, defining “public things,” was exactly the same as it is in article 453 of the Revised Civil Code, except that this article in both of the old codes ended thus: “And the
 
 bed
 
 of rivers, as long as the same
 
 is
 
 covered with water.” I have italicized ¿he singular noun,
 
 bed,
 
 and the singular verb,
 
 is,
 
 to show that the qualifying clause, “as long as the same is covered
 
 *831
 
 with water,” has reference only
 
 to the
 
 bed of a river. In fac.t, the arrangement of the language, or context, makes it obvious that this qualifying clause, “as long as the same are covered with. water,” refers only to the beds of rivers. But, if we should include the beds of inland lakes, among the beds of the bodies of water mentioned in this article of the Code, the character of the beds of lakes, as public property, would continue only “as long as the same are covered with water.” And yet it is well settled, by the several decisions which I have cited', particularly in the case of State v. Jefferson Island Salt Mining Company, that the beds of the navigable lakes, as they were in 1812, have continued.to belong to the State, whether they have remained covered with water or have become dry, in whole or in part.
 

 The attorneys for the State, in their brief in this case, invoke and rely upon, primarily, articles 509 and 510 of the Civil Code. These articles, as I have said, are the only statute law by which an owner of land bordering on a water course may acquire additional land or lose what he has, by effect of a change in the shore lines, caused by erosion or any other natural cause. But these articles are not applicable to lakes. It was so said in the Erwin Case and in the several earlier decisions cited in that case. In fact, it has never been held otherwise. Article 509 declares that accretions which are added imperceptibly to land “situated on the shore of a river or other stream,” and which are called alluvion, belong to the owner of the land so situated. Article 510 declares that the same rule applies to derelictions caused by “running water retiring imperceptibly from one of its shores and encroaching on the other,” and, hence, that the owner of the land adjacent to that which is left dry becomes the owner of it also, but that “the owner of the opposite shore” cannot claim the land which he has lost. It was pointed out in the opinion rendered1 in the Erwin Case, that it is
 
 impossible that the
 
 redactors of these articles of the Code intended that they should be applied to lakes. It is not possible that the'omission of the word “lakes” was accidental — not deliberate. The words “river or other stream” are used in the first paragraph of article 509, and the words “river or stream” are repeated in the second paragraph; and the term “running watejr” is used in article 510. No other body of water is mentioned in either article except a river or stream, or running water. Articles 509 and 510 were, respectively, articles 501 and 502 of the Code of 1825, and were articles 13 and 14 of title 2 of book 2 of the Digest, or so-called Code, of 1808, and are, substantially, articles 556 and 557 of the Civil Code of France. In that Code, article 558 declares that the provisions of articles 556 and 557 do not apply to lakes or ponds. The redactors of the Louisiana Codes, therefore, could not have overlooked the word “lakes.” They did not deem it necessary to say that these articles, providing for the acquisition or loss of land by accretion or dereliction, or the encroachment on the shore of a “river or other stream” or “running water,” were not applicable to lakes, because they took it for granted that no one would imagine that the words “river or other stream” or “running wa
 
 *833
 
 ter” would mean “lake.” If the redactors of these articles of the Codes had intended to say “lake,” they would have said “lake.” In the Code Napoleon, in article 556, in both paragraphs, the words are “fleuve ou riviere”, which are translated by Cachard, literally, into “river or stream.” In article 557 the word's are “l’eau courrante,” which are translated by Cachard, literally, as “running water.” The term “running water” was adopted in article 14 of title 2, book 2, of the Digest of 1808, and also in article 502 of the Code of 1825, which article was adopted verbatim in the revision of 1870. But, in both paragraphs of article 13, title 2, book 2, of the Digest, of 1808, and also in both paragraphs of article 501 of the Code of 1825, the words which, in the Code Napoleon, are “fleuve ou riviere,” are “river or creek”; which, in article 509 of the Revised Civil Code, are changed to “river or other stream.” That was an accurate translation, because the French word fleuve means large river; and the French word riviere means “stream,” or a river of less magnitude than one which would be called fleuve. What I have undertaken to demonstrate is that the care and discrimination with which the redactors and translators of these articles of the Codes selected their words leaves no doubt that they did not intend that the term “river or other stream,” or “running water,” should mean or include “lake.” Article 510 of the Revised Civil Code, as I have said, has a second paragraph, which provides: “This right does not take place in case 'of derelictions of the sea.” The same language exactly was used in the second paragraph of article 502 of the Code of 1825, and in the second paragraph of article 14, title 2, book 2, of the Digest, or Code, of 1808. The purpose of this paragraph was to avoid any conflict or confusion between these articles, referring to a river or other stream, and the articles referring to the seashore. In the Code Napoleon, the second paragraph of article 557, is substantially the same. It is translated, literally, thus: “Such right does not apply to derelictions of the sea.” The next article, 558, in the Civil Code of France, declares: “Alluvion (L’alluvion) does not take place in connection with lakes and ponds,” etc. As explained in the Erwin Case, the reason why the compilers of the Louisiana Codes did not adopt the provisions of article 558 of the Code Napolean was because it was deemed plain enough that the language of the articles on the subject of accretion and dereliction were applicable to rivers and other streams only, not lakes. In fact, lakes are not mentioned at all in the Revised Civil Code, or in the Code of 1825, or in the Digest, or Code, of 1808. It was left for the courts to observe, and, as the Attorney General pointed out in his brief in the- case of State v. Jefferson Island Salt Mining Company, this court did observe, consistently, and particularly in the case of State v. Erwin, “the rule that there is no such thing as resultant or incidental right to property by accession unless expressly given by law.”
 

 On that subject, here is how the Attorney General and the Special Assistant Attorney General referred1 to “State v. Erwin, 173 La. 507, 138 So. 84,” on page 303 of their brief in State v. Jefferson Island
 
 *835
 
 Salt Mining Company, decided on rehearing on August 30, last year, viz.:
 

 “Opposing counsel has cited State v. Erwin, 173 La. 507, 138 So. 84. To what avail? We are well content. Viewed from every angle, this case is against him; indeed, it is an additional reinforcement of the State’s case, and recognizes the rule that there is no such thing as resultant or incidental right to property by accession unless expressly given by law. It was there held that a riparian proprietor of [on] an inland lake did not, because of erosion or overflow of his adjoining land by the waters of the lake, lose his land so eroded or overflowed and transformed ex vigore into public property, but that the boundary line remained stationary as originally meandered. Briefly, State v. Erwin, supra, holds that, since the Code has made no provision for
 
 decretion
 
 on inland lakes, it will not be implied; and, conversely, and a fortiori, there is no right to accretion or dereliction. Or, put in another way: with respect to inland lakes there is neither ‘give’ nor ‘take’ as is provided for in the case of streams.”
 

 In the case of the State v. Jefferson Island Salt Mining Company, the State was suing for damages, because the defendant, owning lands bordering on a navigable lake, called Lake Peigneur, was said to have extended its subterranean operations beyond the meander line of the lake, as it was in 1812. The lake had shrunk, since 1812, so that the meander line, when the suit was tried, was a considerable distance from the land of the defendant. The analysis of the testimony, to determine where the meander line of the lake was in 1812, which was held to bé the boundary line between the land which the State had acquired by virtue of her sovereignty and the land of the defendant, covers forty pages of the report of the case, pages 329-370 of 183 La., pages 153-167 of 163 So. Having determined the boundary line as it was in 1812, a majority of the members of the court increased the judgment against the defendant and in favor of the State, from $6,193.48 to $1,165,419.54, which, with the interest allowed and accrued, amounted to more than $1,400,000, for damages for the value of the salt which the defendant had mined, under the area extending from the rim of the lake as it was in 1812 to the rim of the lake as it was when the suit was tried. In the eleventh paragraph of the syllabus the doctrine of the decision is stated thus:
 

 “In state’s trespass action for salt mining operations on [extending under] bed of lake alleged to be owned by state, evidence held to show that lake was navigable body of water in 1812 when Louisiana was admitted into Union, so that state was owner of original title of bed of lake, and riparian rights were confined to high-water mark of lake in 1812.”
 

 In that case, the court cited State v. Bozeman, 156 La. 635, 101 So. 4, which had reference to a navigable lake in Cad-do parish, in support of the declaration that the State’s sovereign title to the beds of its navigable waters should “be literally read into the titles of all lands bordering on such waters.” That declaration was made with reference to the beds of
 
 *837
 
 the navigable lakes as they were in 1812, according to the ruling in State v. Jefferson Island Salt Mining Company. Accordingly, the rule of property which was announced' in the Erwin Case, and in the preceding cases on this subject, ought to be literally read into the titles of all lands bordering upon navigable lakes.
 

 There is no dispute about the facts of this case. The land in dispute is the submerged part — being the western part — of a tract described as Secs. 2, 3, 4, 9, and 10, in T. 14 S., R. 3 W., on the east side of Grand Lake, in Cameron parish. The sections are contiguous, sections 9 and 10 being south of and adjoining sections 4 and 3, respectively, and' section 2 being east of and adjoining section 3. These sections were acquired by the State by the swamp land grants of 1849 and 1850, and were sold by the State to J. B. Watkins, by patent dated May 24, 1883. The plaintiff in this suit acquired title by mesne conveyances from Watkins. This township was surveyed by the United States government in 1873, and the official plat, showing the meander line of the lake at that time, along the western front of sections 4 and 9, was approved by the Register of the State Land Office and placed on record' in the State Land Office on the 10th of July, 1873. There is no dispute about the correctness of the survey. In 1933 the Board of State Engineers, under the direction of Governor Allen, and as authorized by the general laws on the subject, Act No. 123 of 1902 and Act No. 59 of 1928, made a topographical survey and plat of the shore line of Grand Lake, in T. 14 S., R. 3 W., and traversed and established the meander line, as it was then, and as it was in 1883, when the State issued' the patents for the lands in that township. The meander line as it was in 1883 had to be computed, of course, and it was computed by the state engineers, working in conjunction with a civil engineer employed by the plaintiff in this suit. It was agreed that the meander line as thus computed, and as marked on the plat made by the Board of State Engineers, “Bank Line 1883 (Computed),” was where the meander line of the lake was in 1883, when the patent was issued to Watkins for the land bordering on the lake. The plaintiff, in its petition, prayed' to have the line marked “Bank Line' 1883 (computed)” declared to be the boundary line between its land and the land which the State owns by virtue of her sovereignty. The State, in her answer to the suit, prayed to have the present shore line of the lake declared to be the boundary line. The plaintiff does not claim any of the submerged land west of the line marked “Bank Line 1883 (computed)” because that is the western boundary line of the land which the State sold' to Watkins. Some of the land lying west of that line was acquired by the State by the swamp land grants of 1849 and 1850, after she had acquired the bed of the lake by virtue of her sovereignty-
 

 The plaintiff in this case, anticipating that the State would make the same contention and argument that was made in the Erwin Case, pleaded in the petition that the plaintiff relied upon the rule of property which was recognized and affirmed in the Erwin Case, and pleaded that a departure from that rule in this case would
 
 *839
 
 be violative of the Fourteenth Amendment of the Constitution of the United States. My opinion is that the plea is well founded.
 

 It is said in the prevailing opinion in this case that the attorneys for the plaintiff contend “that even though the decision of the court in that case [the Erwin Case] is erroneous and was rendered by a divided court, the rule announced therein is binding on this court under the doctrine of stare decisis, because the decision established a rule of property,” etc. I do not find anything in the pleadings or in the brief of the plaintiff that appears to me to be a concession or suggestion on the part of the attorneys for the plaintiff that the decision rendered in the Erwin Case is erroneous, or that its value as authority is impaired by reason of its having been rendered by a divided court. That a decision is rendered by a divided court does not impair its authority, but, on the contrary, shows that the case was well considered. In Aicard v. Daly, 7 La.Ann. 612, in 1852, Justice Rost, for himself as well as for the court, after stating the question in the case, said:
 

 “On this question, the present organ of the court differed from his brethren on a former occasion, and thought the view he took most consonant with principle, if not with authority. As, however, authority has prevailed, and the decision of the court hás become a rule of property, he feels bound to consider the question solved in the affirmative.”
 

 The Supreme Court of South Carolina, in Matthews v. Clark, 105 S.C. 13, 89 S.E. 471, 472, had this to say about decisions rendered “by a divided court,” viz.:
 

 “It is said that the authorities cited embrace opinions by a divided court. It is well to clear up a misapprehension in the minds of the bar as to the force of a decision of the court in cases in which the court is divided. A dissenting opinion shows that the case has been thoroughly considered. The opinions of the majority govern. When that question arises in future cases, the dissenting justice is as much bound by the decision of the majority as is the justice who wrote the prevailing opinion. The dissenting opinion, within the jurisdiction of the court, strengthens the authority of the case.”
 

 In L. D. Willcutt & Sons Co. v. Driscoll, 200 Mass. 110, 85 N.E. 897, 899, 23 L.R.A.(N.S.) 1241, the Supreme Judicial Court of Massachusetts, in adhering to the decision of a “divided court” in Martell v. White, 185 Mass. 255, 69 N.E. 1085, 64 L.R.A. 260, 102 Am.St.Rep. 341, said:
 

 “In Martell v. White, five justices sat, and four of them, being a majority of the whole court, concurred in the ground upon which it was decided. The case was carefully presented by counsel, the questions involved were regarded as important, and there was a difference of opinion among the judges who sat in it. It was therefore considered' at great length; and the conclusion was reached after a most exhaustive discussion and the most careful deliberation. It stands as a solemn adjudication by this court after such discussion and deliberation. * * * There is every reason why the doctrine of stare decisis
 
 *841
 
 should apply; and so far at least as respects this commonwealth the case must be held as settling the correctness of the principle upon which the decision was based.”
 

 It is said in the prevailing opinion in this case that the majority opinion in the Erwin Case expressly overruled “the doctrine announced in the case of New Orleans Land Co. v. Board of Levee Commissioners of Orleans Levee District, 171 La. 718, 132 So. 121,” and “that the case of State v. Erwin is out of line with Louisiana, jurisprudence on the subject of ‘lakes’ and it has never been followed.” If the majority of the members of the court mean, by saying “it has never been followed,” that the question which was decided in the Erwin Case has not arisen heretofore since that case was decided, I respectfully submit that there is no reason why it should have arisen again. The case was decided only five years ago, and was supposed to be finally decided. It was cited as authority, and with approval, by the State of Louisiana, represented by her Attorney General, in the case of the State against the Jefferson Island Salt Mining Company. The Attorney General did not consider the decision in the Erwin Case as being of less value as authority because of its having been rendered by a divided court.
 

 As I understand the decision rendered in the Erwin Case, the court did not overrule —or intend to overrule — the decision which had been rendered' in the New Orleans Land Company Case, but reconciled that decision with the decision in the Erwin Case.' The decision in the New Orleans Land Company Case was correct. The company sued the levee board for its having appropriated, for a public purpose, land belonging to the company, a part of which was in the bed of the lake, and of little or no value as private property. The plaintiff in the suit contended, primarily, that the levee board did not have constitutional authority to appropriate the land — or to expropriate it — for the purpose for which it had been appropriated, namely,'the public-improvement project on the lake front, which was provided for by a constitutional amendment. In the alternative, the plaintiff claimed the value of the land that was appropriated. When the court decided that the levee board had the constitutional authority to expropriate, or to appropriate, the plaintiff’s land, all that remained to be decided was the value of the land. It mattered not whether the part of the land which was under'the lake did or did not belong to the plaintiff before the levee board appropriated it, because that part of the land had no value as private property. In the opinion rendered in the New Orleans Land Company Case it was' said— unnecessarily — that it made no difference whether Lake Pontchartrain should be classed as a tidal lake — as seashore — or as an inland,' fresh-water lake. That statement alone, it was said in the Erwin Case, “must yield to the views herein expressed.” I shall quote now what was. said on that subject in the original opinion rendered in the Erwin Case, viz.:
 

 “So far as relates to fresh water navigable lakes, with which we are presently alone concerned, there can be no question that their bottoms belong to the state, up
 
 *843
 
 to the high-water mark, by virtue of its sovereignty. But this means their bottoms, as they existed, at the time the state was admitted into the Union, and does not include that part of such bottoms, later formed by the action of the waters in washing away the soil of lands, privately owned, and thereby submerging them. The submerged lands still belong to the owners. The New Orleans Land' Company Case, to this extent, must yield to the views herein expressed. It may be said that the question there presented, as to ownership of the submerged part, played no important part in that controversy, for, being submerged, and with nothing apparent to add to its desirability, it obviously had but little, if any, value in private hands.”
 

 In the opinion rendered on rehearing in the Erwin Case, the court again reconciled its decision with the decision rendered in the New Orleans Land' Company, by saying: “That case involved a tract of land bordering on Lake Pontchartrain, which is an arm of the sea (Milne v. Girodeau, 12 La. 324; Zeller v. Southern Yacht Club, 34 La.Ann. [837] 839; and Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249), so that the ruling in that case is not controlling here.”
 

 The seven members of the court were all of the opinion that Calcasieu Lake was an inland lake, and not an arm of the sea, and hence that the lake shore was not seashore. On that question the opinion was not that of “a divided court.” I shall quote now the pertinent part of the opinion rendered on the rehearing in the Erwin Case, from the very beginning of the opinion, or the. opening statement, thus:
 

 “The members of the' court have from the beginning concurred in the view that the body of water lying in Calcasieu and Cameron parishes, referred to as Calcasieu Lake, should be regarded as a lake and not as a river. But some of the members of the court did not subscribe to the view expressed in the majority opinion that articles 509 an'd 510 of the Civil Code with reference to accretion and dereliction do not apply to lakes, but only to navigable rivers or bodies of running water. In the majority opinion we said:' ‘Our conclusion is that these articles do not apply to lakes.’ Three of the justices dissented from that holding; the rehearing was granted', not because of any doubt in the minds of those who subscribed to the majority opinion that such holding is correct, but in order to reconsider the question whether Calcasieu Lake is an arm or part of the sea.
 

 “If in fact it is, the lands involved are not susceptible of private ownership; they belong to nobody in particular; they fall into the class of public things, ‘the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation.’ Civ.Code, arts. 450, 453.
 

 “We have with care and great interest read the most able and exhaustive briefs submitted by counsel for the state and other appellants. We have read the decisions of our own court and those of other jurisdictions cited in support of the contention made and those cited in support of the contrary view, and, after reading them, are thoroughly convinced that under the facts and conditions shown to exist in this
 
 *845
 
 case Calcasieu Lake is not an arm or part of the sea. So convinced, and adhering to our previous holding that articles 509 and 510 of the Code do not apply to lakes, it follows that our former decree must be reinstated.
 

 “We said in our former opinion:
 

 “ ‘The lake is affected more or less by the tides, especially at the southern end, up to which point they frequently flow. As a whole, its waters are usually fresh, though sometimes they are brackish, and occasionally, due to weather conditions, are quite salt/
 

 “Counsel say that, these being the admitted facts, it follows that this lake is an arm or part of the sea. Not so under our holding in the cases of Buras v. Salinovich, 154 La. 495, 97 So. 748, 750, and Morgan v. Nagodish, 40 La.Ann. 246, 3 So. 636, 640. * * *
 

 “As to whether Calcasieu Lake is an arm of the sea, these cases are directly in point and are decisive.
 

 “Counsel direct our attention to the case of New Orleans Land Co. v. Board of Levee Commissioners, 171 La. 718, 132 So. 121. That case involved a tract of land bordering on Lake Pontchartrain, which is an arm of the sea (Milne v. Girodeau, 12 La. 324; Zeller v. Southern Yacht Club, 34 La.Ann. [837] 839; and Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249), so that the ruling in that case is not controlling here.”
 

 I respectfully submit that, if the decision in the Erwin Case had overruled the decision in the New Orleans Land Company Case, that would be all the more reason why the court should adhere to the decision in the Erwin Case, instead of reviving the overruled decision in the New Orleans Land Company Case. If not, the members of the bar — and all parties interested in the all-important question presented here — may well doubt that the decision in this case — which is said to overrule the decision in the Erwin Case — will be adhered to.
 

 I shall endeavor now to show that the decision in the Erwin Case is not “out of line with Louisiana jurisprudence on the subject of ‘lakes.’”
 

 The case of Milne v. Girodeau, 12 La. 324, decided in 1838, was as stated in the prevailing opinion in this case, a petitory action against the possessor of a lot in the bed of Lake Pontchartrain. Milne held title from Andre Jung, for a tract of land “containing 2,167 arpens,” which Jung had acquired by virtue of a French grant, dated July 16, 1764, that is 48 years before Louisiana was admitted into the Union. Milne laid off lots and streets, and on the plat, which was made in 1831, the lots and streets extended into the bed of the lake. It is said in the prevailing opinion in this case that “some of the lots and squares were shown on the plat as extending into the bed of the lake to the point of the original line of property at the'time of its acquisition from the French government,” which was 48 years before the State acquired title to the bed of the lake, by virtue of her sovereignty. Milne contracted to sell a lot, in' the bed of the lake, to Jean Toussaint, and Toussaint transferred
 
 *847
 
 his claim to Jacques Girodeau, who built a house on the lot, on piling out in the lake. In the suit between Milne and Girodeau there was no contention, such as there is in this case, that the State of Louisiana had acquired title to the lot by the process of erosion of the lake shore. In fact, articles 501 and 502 of the Civil Code of 1825, which are articles 509 and 51'0 of the Revised Civil Code, were not even mentioned in the case. I infer from the facts of the case, as stated in the prevailing opinion in the present case, and from the date of the French grant which Milne held, that the land that was in contest in that case was a part of the bed of the lake when Louisiana acquired title thereto by virtue of her sovereignty. - At any rate, that was the basis of the decision, as far as the facts of the case are disclosed. The difference between that case and this case is that in this case the State did not acquire title to the land in contest by virtue of her inherent sovereignty, but acquired it by virtue of the swamp land grants of 1849 and 1850, and afterwards sold it to the plaintiff’s author in title. In this case the State is claiming that she regained title to the land by reason of the encroachment of the water on the shore of the lake. There was nothing like that in Milne v. Girodeau.
 

 In the case of Zeller v. Southern Yacht Club, 34 La.Ann. 837, in 1882, the plaintiff, owning a lot fronting on Lake Pontchartrain, claimed alluvion or accretion ill front of his lot. The defendant pleaded that Lake Pontchartrain was an arm of the sea, and that the right to alluvion or accretion did “not take place in case of derelictions of the sea.” Rev.Civ.Code, art. 510. The court held that it made no difference whether Lake Pontchartrain should be regarded as an inland lake or as an arm of the sea, because the right to accretion did not result either from dereliction on the shore of a lake or from derelic- ' tion of the sea. That was the same as to say that a change in the shore line of a lake, unlike a change in the shore line of a river or other stream, does not change the boundary line between the land which the State owns by virtue of her sovereignty and the land bordering upon the lake. Here is what the court said:
 

 “The plaintiff, however, denies that Lake Pontchartrain is either the sea or an arm of the sea, and, therefore contends that this question of accretions or alluvion on the sea shores has no applicability to this case. It might be a sufficient reply to this, to say, that the only acknowledged right to accretions as property under our law, are those formed on rivers and running streams; and that there is no recognition of any property right therein, when formed on lakes, bays, arms of the sea, or other large bodies of water, and that the modes or ways of the acquisition of property are limited to those expressly prescribed by law and cannot be extended by implication. But we consider this question virtually disposed of in the case of Milne v. Girodeau, 12 La. 324.”
 

 In Sapp v. Frazier, 51 La.Ann. 1718, 1725, 26 So. 378, 381, 72 Am.St.Rep. 493, in 1899, the court adopted the language of Zeller v. Southern Yacht Club' in support of the declaration that the law of ac
 
 *849
 
 cretion and dereliction was not applicable to the shores of lakes, thus: “The modes or ways of the acquisition of property are limited to those prescribed by law. Zeller v. Southern Yacht Club, 34 La.Ann. [837, 838] 839.”
 

 In Slattery v. Arkansas Natural Gas Co., 138 La. 793, 70 So. 806, in 1916, the court quoted with approval from Zeller v. Southern Yacht Club what was said in that case to the effect that the right to accretion did not result from dereliction on lake shores. In the third paragraph of the syllabus, in the Slattery Case, it is said:
 

 “Article 509 of the Civil Code of Louisiana gives to the owner of the soil situated on the edge of the waters of a river or other stream the accretion, called ‘alluvion,’ which may ‘successively and imperceptibly’ be added or ‘formed’ thereto, but the article has no application to conditions arising upon the shore of a body of water found to be neither a river or stream, but a navigable lake.”
 

 In the case of the Bank of Coushatta v. Yarborough, 139 La. 510, 71 So. 784, 787, in 1916, the court again said that the right to accretion did not result from dereliction on a lake shore. After stating that some of the essential conditions for the acquisition of title by accretion were not present in the case, the court said:
 

 “It is not suggested that the land here claimed is alluvion, added to that of which the entryman went into possession, ‘successively and imperceptibly,’ by the waters of a river or a stream (as contemplated by G. C. art. 509), nor yet that it is land which has been left dry by running water, retiring, imperceptibly, from one of its shores, and encroaching upon another (within the meaning of C.C. art. 510).”
 

 These cases, dating as far back as 1882, namely, Zeller v. Southern Yacht Club, Sapp v. Frazier, Slattery v. Arkansas Natural Gas Co., and Bank of Coushatta v. Yarborough, were cited with approval in State v. Erwin, and as having established a rule of property.
 

 In fact, this rule of property, which was announced originally in Zeller v. Southern Yacht Club, has been recognized by the law writers in other jurisdictions for many years, as the rule which prevails in Louisiana.
 

 In 29 Cyc. (published in 1908) pp. 348 and 349, under the title “Navigable Waters,” and under the subtitle, “Accretions and Alluvion, and The Ownership thereof,” it is said that, in the absence of a statute to the contrary, alluvion belongs to the riparian or shore owner to which the accretion is attached; and in the footnote to this statement, No. 78, it is said: “In Louisiana, however, the rule does not apply to lakes. Zeller v. Southern Yacht Club, 34 La.Ann. 837.”
 

 In 40 Cyc. (published in 1912) p. 637, two Utah cases and a case decided by one of the federal courts are cited as maintaining that the owner of land fronting on a lake is entitled to the benefit of accretion, but in the footnote, No. 96, is the statement: “Contra, Zeller v. Southern Yacht Club, 34 La.Ann. 837.”
 

 In 45 C.J. (published in 1928) p. 524, § 192, under the title “Navigable Waters,”
 
 *851
 
 and the subtitles, “Batture, Reliction or Dereliction,” and “Ownership,” in the footnote No. 31, in support of the proposition that the law of dereliction and accretion .applies only to rivers and other streams, .and not to lakes, is cited Zeller v. Southern Yacht Club, 34 La.Ann. 837; and, in .the same footnote, it is said:
 

 “The Civil-Code provision giving accretions to the riparian owner on a river or stream does not apply to a navigable lake. Slattery v. Arkansas Natural Gas Co., 138 La. 793, 70 So. 806. (2) Lands which have become dry because of the subsidence of Ferry Lake, which was a navigable body of water when Louisiana was admitted into the Union, became the property of the State by virtue of her sovereignty. State v. Standard Oil Co., 164 La. 334, 113 So. 867.”
 

 In 67 C.J. p. 856, § 281, under the title “Waters,” and the subtitle “Accretion and Reliction,” in support of the proposition that the owner of land fronting on a lake is not entitled to the benefit of accretion, is cited in the footnote, No. 74, Zeller v. Southern Yacht Club, 34 La.Ann. 837; and there appears this statement:
 

 “Thus, under statutes specifically enumerating and limiting rights to accretion to land formed on rivers and running streams, riparian owners on lakes acquire no rights to land so formed. Zeller v. Southern Yacht Club, 34 La.Ann. 837.”
 

 It appears, therefore, that the rule of property on this subject was heretofore well established in Louisiana, and was generally recognized throughout the country, long before the Erwin Case arose.
 

 I' shall explain now why, in my judgment, the decisions cited in the prevailing opinion in this case to support the State’s claim to the land in contest do not support it. The cases cited are Louisiana Navigation Co. v. Oyster Commission of Louisiana, 125 La. 740, 51 So. 706; State v. Bayou Johnson Oyster Co., 130 La. 604-610, 58 So. 405, 407; State v. Richardson, 140 La. 329, 349, 72 So. 984; State ex rel. Board of Commissioners v. Capdeville, 146 La. 94, 95, 106, 83 So. 421; Wemple v. Eastham, 150 La. 247, 90 So. 637; State v. Bozeman, 156 La. 635, 101 So. 4; Barney v. City of Keokuk, 94 U. S. 324, 337, 338, 24 L.Ed. 224, 228.
 

 In the case of the Louisiana Navigation Co. v. Oyster Commission of Louisiana, and in State v. Bayou Johnson Oyster Co., the lands in contest were under the waters of the Gulf of Mexico, or the bays opening upon the Gulf, and surrounding what — in both cases — is called “the peninsula of the parish of St. Bernard.” The declaration quoted from State v. Bayou Johnson Oyster Co., “that the states admitted into the Union since the adoption of the Constitution became at once entitled to the soil under their navigable waters, the same as the original states,” etc., is not disputed in this case. When Louisiana was admitted into the Union, she became
 
 at once
 
 entitled to the soil under Grand Lake; but she did not become entitled to the land in contest in this suit, until the date of the swamp-land grants of 1849 and 1850.
 

 The case of the State v. Richardson was a petitory action to recover alluvion or
 
 *853
 
 accretion which had formed within the banks of Red river, and which had become valuable oil land. The case is stated on page 331 of 140 La., on page 985 of 72 So., thus: “The suit was brought for the purpose of determining the limits of the state’s ownership in the bed of Red river at the point indicated,” etc. It was held that the land in contest, being alluvion or accretion, which had been formed imperceptibly to the soil situated on the shore of the river, belonged to the defendant, Richardson, as owner of the riparian land. Surely, that decision is not applicable to land bordering on a lake.
 

 The case entitled State ex rel. Board of Commissioners v. Capdeville was a mandamus suit, in which the board of commissioners of the Atchafalaya Basin Levee District undertook to compel the State Auditor, Paul Capdeville, to transfer to the board the beds of four navigable lakes, on the theory that the land in the beds of these lakes was acquired by the State by virtue of the swamp land grants of 1849 and 1850, and hence that the land was transferred to the levee district by. the act creating the district, Act No. 97 of 1890. It was decided that, as the lands in contest were in the beds of these navigable lakes when Louisiana was admitted into the Union, the State’s title to the lands came by virtue of her sovereignty, and not by virtue of the swamp lands grants, and hence that the land were not transferred to the levee district by the statute creating the district. There is nothing in that decision at all relevant to this case.
 

 In Wemple v. Eastham, the land in contest was the bed and banks of a navigable stream, called Bayou Pierre river, and of a nonnavigable stream, called Dolet bayou. The defendant, Eastham, held a lease from the State, under the provisions of Act No. 30 of 1915 (Ex.Sess.), to drill for oil, gas, and other minerals, “within the meandering lines of Bayou Pierre river and Dolet bayou,” etc. The plaintiff, Wemple, owning land bordering on Bayou Pierre river and land through which Dolet bayou ran, sought to enjoin Eastham from drilling wells in the beds or on the banks of these streams. Wemple claimed that neither of the streams was ever navigable, but, in the alternative, that, if either stream should be held to have been once navigable, he owned the banks of the stream, being the land between the ordinary high-water mark and the ordinary low-water mark. The defendant admitted that Dolet bayou had never been navigable, and hence that Wemple owned its bed, as well as its banks. It was held that Bayou Pierre river had been navigable, and hence that the State owned its bed, but that Wemple, as the riparian owner, owned the banks of Bayou Pierre river, which the court described as the “land between the ordinary high-water mark and the ordinary low-water mark.” Surely, there is nothing in the decision in that case that is at all appropriate to land bordering on a lake.
 

 State v. Bozeman, as I have pointed out, is authority for the proposition only that the meander lines of the navigable- lakes, as they were in 1812, which are the boundary lines between the lands which the State acquired by virtue of her sovereignty and that which she did not so acquire, have remained where they were in 1812, notwith
 
 *855
 
 standing any changes that nature may have wrought in the shore lines of the lakes. That decision is in accord with the decision in the Erwin Case.
 

 Barney v. City of Keokuk, 94 U.S. 324, 24 L.Ed. 224, was an action of ejectment, against the city of Keokuk, in Lee county, Iowa, and several railroad companies and a packet company, to recover land occupied by them with railroad tracks and sheds, on the bank of the Mississippi river, in front of lots owned by the plaintiff, Barney. The decision rendered in the case is not at all appropriate to this case. That case was cited in the dissenting opinion in the Erwin Case, as authority for the proposition that private ownership of land under the edge of a navigable body of water is against public policy. It is said in the prevailing opinion in this case that this decision rests upon sound principles of public policy. The public policy of this or any other state on that subject is whatever the Legislature has declared it to be. The Legislature of this state has had more than 50 years in which to change the law on this subject if the law as stated in Zeller v. Southern Yacht Club, in 1882, and as recognized in Cyc. and Corpus Juris, was not satisfactory. It is suggested also in the prevailing opinion in this case that the Erwin Case set a dangerous precedent, and might produce undesirable results. No danger is pointed out; no undesirable results are specified; nor hás any broad principle of public policy ever entered into this case. The State officials do not intend to dedicate the land in contest to a work of public improvement, as in the case of the public-improvement project on Lake Pontchartrain. The intention is for the State to lease the land in contest for the production of oil, gas, or other minerals, and to receive the bonuses and royalties thereon, as the State leased the land under the edge of Calcasieu Lake, without avail, to the Louisiana Land & Exploration Company, coplaintiff in the Erwin Case. What is it that constitutes the “dangerous precedent” in the Erwin Case? The oil companies that lease these lake bottoms from the State are obliged to obtain permission from the War Department — in the same way that an oil company leasing from the land owner has to obtain such permission —to construct derricks or other obstructions on the lake. The oil derricks erected by the oil companies holding leases from the State are not any less objectionable to navigation on the lakes than the derricks erected by the oil companies holding leases from the owners of the submerged lands. It is true, of course, that the state treasury will profit to the extent of the bonuses and royalties if the State is permitted to take these submerged lands from the owners, and lease them to operating companies for the production of oil, gas, and other minerals; but the taking of these lands by the State, for any such purpose, after the State has sold the lands and collected the price, and has collected taxes on them for many years, would not be sanctioned by any consideration of public policy, not any more than it is sanctioned by express law.
 

 Apropos this subject, it is said in the prevailing opinion in this case that the doctrine of stare decisis, even with regard to a rule of property, must yield when it ap
 
 *857
 
 pears that, by following, rather than by disregarding,
 
 previous erroneous decisions from which an evil resulted, the community would suffer great damage.
 
 It is said also that this court has never hesitated to overrule a line of decisions establishing a rule of property,
 
 when greater harm would result from perpetuating the error than from correcting it.
 
 That implies, as I understand it, that “an evil resulted” from the decisions in the Erwin Case; that, if the decision should not be overruled, “the community would suffer great damage”; and that “greater harm would result from perpetuating the error [which is said to have been committed in the Erwin Case] than from correcting it.” I respectfully submit, as I have pointed out, that there was no error committed in the decision in the Erwin Case; no “evil resulted” from the decision; no “community would suffer great damage” from our following the decision in the Erwin Case; no “greater harm would result from perpetuating” the doctrine of the Erwin Case, than from reversing it. In fact the attorneys for the State have not specified any evil consequence that has resulted or could result from the decision in the Erwin Case. The Attorney General, as I have said, spoke favorably, in the case of the State v. Jefferson Island Salt Mining Company, of the decision in the Erwin Case; and he succeeded on the corollary of the doctrine of the Erwin Case.
 

 It is said in the prevailing opinion in this case that the attorneys for both parties say “that the main point in the case is the correctness or incorrectness of the decision in State v. Erwin, supra, and whether or not it should be followed or overruled.” My understanding of the position of the attorneys for the plaintiff is that, primarily, they insist that the decision rendered in the Erwin Case is binding upon the State, and should not be reopened at all by the court; but, of course, if the court decides to reconsider now the question which was decided finally in the Erwin Case, as if it were res nova, or res integra, the attorneys for the plaintiff are convinced that the decision in the Erwin Case is correct. They ought to be so convinced because, as I have said, they were unsuccessful in representing the Louisiana Land & Exploration Company, as coplaintiff with the State, in the Erwin Case.
 

 Decisions on the subject of res judicata are cited in the prevailing opinion in this case, as a sanction for the overruling of the decision in the Erwin Case. I respectfully submit that no decision, or precedent, can ever be found to sanction the overruling of a decision establishing a rule of property, after mature deliberation and without any oversight or inádvertence, where the only reason for the overruling of the decision is a difference or change of opinion on the part of a majority of the individual members of the court, as newly constituted. In all but one of the cases cited in the prevailing opinion, as instances where the court has overruled a previous decision, an inadvertence was committed in the previous decision. For example, in the first case cited on this subject, Quaker Realty Co. v. Labasse, 131 La. 996, 1008, 60 So. 661, 665, Ann.Cas.l914A, 1073, the court justified the
 
 *859
 
 overruling of a decision on the ground that two previous decisions were by that decision “overruled without being referred to, as if having escaped altogether the attention of the court.” No former decision escaped the attention of the court in deciding the Erwin Case. In Lepine v. Marrero, 116 La. 941, 41 So. 216, which is cited in the prevailing opinion in this case, the court overruled Hutchinson v. Rice, 109 La. 29, 33 So. 57, and reinstated the previous decisions, which had been overlooked entirely in Hutchinson v. Rice. In the next case cited in the prevailing opinion in this case, Reeves v. Globe Indemnity Co., 185 La. 42, 168 So. 488, the court overruled the decision in West Orleans Beach Corporation v. Martinez, 180 La. 31, 156 So. 165, 166, but only on a question of pleading, or adjective law. In the overruled case it had been held: “Our conception of the law is that a petition which does not allege a cause of action is, legally speaking, no petition, and hence it cannot be amended.” That expression was taken, verbatim, from the opinion rendered, originally, in Tremont Lumber Co. v. May, Assessor, 143 La. 389, 395, 78 So. 650; but, in the West Orleans Beach Corporation Case, the court overlooked the fact that the court had granted a rehearing in the Tremont Lumber Company Case, and on rehearing had reversed its original ruling and held that the petition did disclose a cause of action. I dissented from the
 
 original
 
 decision in that case, as well as from the decision in the West Orleans Beach Corporation Case. So did the author of the opinion originally rendered in the Erwin Case dissent from the decision in the West Orleans Beach Corporation Case. Another recent decision that is cited in the prevailing opinion in the present case is the case entitled In re Hibernia Bank & Trust Co. (Pan American Life Insurance Co., Intervener), 185 La. 448, 169 So. 464, 477, where the court overruled the decision which was rendered only four months before, and in the same liquidation proceeding, namely, In re Liquidation of Hibernia Bank & Trust Co. (Jones County, Intervener), 181 La. 335, 159 So. 576. In the Jones County Intervention the court construed Act No. 63 of 1926, which allowed a lien on the assets of a bank, to protect the sender of an item to the bank, as agent, for collection and remittance or delivery to its principal, and not for deposit, the construction being that the expression “for collection and remittance or delivery to its principal” (section 1) was applicable where the item was sent to the bank, not for deposit, but as agent, for collection and delivery — or payment — to the holders of certain specified bonds that were soon to become due and payable at the bank. Four months later, in the Intervention of the Pan American Life Insurance Co. in the same liquidation proceeding, the court pronounced the decision in the Jones County Intervention “overruled.” I was absent from the State at the time, and did not know of the overruling of the Jones County decision until some time after it was done. I wrote the opinion for the court in that case; and the only justice who dissented was the one who wrote the opinion in the Pan American Life Insurance Company Intervention, and who has written also the prevailing opinion in this case.
 
 *861
 
 His opinion in the Pan American Life Insurance Company Case was concurred in by only two members of the court who had subscribed to the opinion in the Jones County Intervention, and by one member who came to the bench after the Jones County decision was rendered. The two other members of the court, who had subscribed to the Jones County decision, dissented from the overruling of the decision, thus:
 

 “ROGERS and ODOM, JJ., dissent, being of the opinion that the court should adhere to the interpretation which it placed on Act No. 63 of 1926 in the case of In re Liquidation of Hibernia Bank & Trust Co., Jones' County, Intervener, 181 La. 335, 159 So. 576, and, on the authority of that case, affirm the judgment.”
 

 I respectfully submit, therefore, that the overruling of the decision in the Jones County Intervention, four months after it becáme final, and in the same liquidation proceeding in which it was rendered, set a bad precedent, especially as no reason therefor was given that was not considered in the opinion rendered in the Jones County Intervention.
 

 In the concluding paragraph in the prevailing opinion in this case it is said that the plaintiff’s plea that the overruling of the decision in the Erwin Case, to the plaintiff’s prejudice, would be violative of the Fourteenth Amendment of the Constitution of the United States, is “without merit,” because the plaintiff bought the land in contest before the decision in the Erwin Case was rendered. From this I infer that the contract clause in the Constitution may yet protect all who have bought land bordering upon a navigable lake since the Erwin Case was decided. I respectfully submit that the equal protection clause also is entitled to consideration. Besides, as I have shown, the doctrine of the Erwin Case was not announced- as an original proposition in that case, but was recognized as a rule of property for more than fifty years, since the decision in Zeller v. Southern Yacht Club was rendered.
 

 The Legislature, in 1934, apparently believed that a decision by this court, overruling the decision in the Erwin Case, unlike an act of the Legislature itself, would have a retroactive effect upon the titles to lands bordering upon navigable lakes. Instead of amending — by, means of a statute — the law announced in the Erwin Case, the Legislature, in 1934, made an appropriation of $5,000 “for the purpose of attempting to reverse the case of State v. Erwin, 173 La. 507 [138 So. 84],” etc. The appropriation was included in the general appropriation bill, Act No. 14 of 1934, p. 34, under the heading “Attorney General,”- and the purpose was stated thus:
 

 “For expenses of litigation for the purpose of attempting to reverse the casé of State v. Erwin, 173 La. 507 [138 So. 84], which has overthrown prior jurisprudence, and the maintenance of which destroys the usefulness and navigability of all of our inland lakes in South Louisiana.”
 

 I have already shown that the decision in the Erwin Case did not overthrow any prior jurisprudence, or destroy the usefulness or navigability of our inland lakes-
 
 *863
 
 in South Louisiana. The navigability of Calcasieu Lake is not obstructed any more by the oil derricks erected by those who won the Erwin Case than it would be by derricks erected by the Louisiana Land & Exploration Company, as lessee, if the State and the Louisiana Land & Exploration Company had won the Erwin Case. I respectfully submit, though, that the amending of the law which was announced first in Zeller v. Southern Yacht Club, and finally in the Erwin Case, by the overruling of the decision in that case, cannot have a retroactive effect in favor of the State, any more than an amendment by an act of the Legislature would have.
 

 On that subject, in Levy v. Hitsche, 40 La.Ann. 500, 4 So. 472, our predecessors said:
 

 “After the intent and meaning-of a law has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the law as the text itself, and a change in the construction is the same in effect on contracts as an amendment of the'law by means of a legislative enactment.” That was repeated in Lyons v. Veith, 170 La. 915, 920, 129 So. 528.
 

 In Straus v. City of New Orleans, 166 La. 1035, 118 So. 125, 129, referring to the case of Bank of Lecompte v. Lecompte Cotton Oil Co., 125 La. 844, 51 So. 1010, construing a statute, Act No. 30 of 1904, as amended by Act No. 187 of the same year, declaring the conditions under which machinery in manufacturing or industrial establishments should be deemed a part of the real estate, it was said:
 

 “That decision established a rule of property, over 18 years ago; and it is only fair to assume that investors who have bought or taken mortgages upon manufacturing or industrial establishments in this state, including the bondholders represented by the trustee in this case, acted upon the faith of the construction which this court put upon the Act 30 and the Act 187 of 1904, in the decision quoted. If we doubted the correctness of that construction now, we would not change it, so as 'to impair the obligations of contracts presumed to have been made on the faith of it. Southern Grocer Co. v. Adams, 112 La. 60, 36 So. 226; Maxwell-Yerger Co. v. Rogan, 125 La. 1, 51 So. 48. The Supreme Court of the United States treats the construction which the highest court of a state has given to a statute of the state as a part of the statute itself; and if different constructions are given to the same statute at different times, it will not follow the latest decision if thereby contract rights which have arisen under the earlier ruling would be injuriously affected. Douglass v. Pike County, 101 U.S. (11 Otto) 677, 25 L.Ed. 968.”
 

 In Roberson v. Pioneer Gas Co., 173 La. 313, 323, 137 So. 46, 49, 82 A.L.R. 1264, it was said:
 

 “The decisions of the highest court of a state, on the subject of oil and gas leases, or mineral rights, establish rules of property ; and they should not be reversed, even though a contrary rule might be deemed more logical, unles it be by an act of the Legislature. Farmer’s Heirs v. Fletcher, 11 La.Ann. 142; Cunningham v. Steidman, 133 La. 44, 62 So. 346; Minnesota Min
 
 *865
 
 ing Company v. National Mining Company, 3 Wall.(70 U.S.) 332, 18 L.Ed. 42; Truskett v. Closser, 236 U.S. 223, 35 S.Ct. 385, 59 L.Ed. 549; Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856.”
 

 In the case of Douglass v. Pike County, 101 U.S. 677, 687, 25 L.Ed. 968, 971, Chief Justice Waite, for the court, stated the rule, thus:
 

 “After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment of the law by means of a legislative enactment.”
 

 In Anderson v. Santa Anna Township, 116 U.S. 356, 6 S.Ct. 413, 29 L.Ed. 633, the rule is stated in the first paragraph of the syllabus, thus:
 

 “1. While the courts of the United States accept.and apply the construction of the courts of a State of its Constitution or statutes, it is the settled doctrine of this court that rights accruing under one construction will not be lost, merely by a change of opinion in the state court.”
 

 In Bolles v. Town of Brimfield, 120 U.S. 759, 7 S.Ct. 736, 30 L.Ed. 786, the doctrine is stated in the second paragraph of the syllabus, thus:
 

 “2. It is the settled doctrine of this court that rights accruing under one construction [of a statute] will not be lost merely by a change of opinion in the local court.”
 

 In De Elzaburu v. Chaves, 239 U.S. 283, 36 S.Ct. 47, 50, 60 L.Ed. 290, appealed from the Supreme Court of Puerto Rico, the court, referring to a previous construction of a certain “mortgage law,” said:
 

 “This view, to say the least, is a reasonable one; and since it is plain that the decisions, having stood so long unchallenged, have established a rule of property, it seems to us- that they ought not now to be overruled.”
 

 In 15 C.J. p. 949, § 342, under the title “Courts,” and the subtitle “Decisions Constituting Rules of Property,” it is said:
 

 “Stability is especially requisite in the law in regard to titles to real property. Titles may be dependent largely or wholly upon previous decisions, and landed interests would be jeopardized by sudden or frequent changes in the interpretation or construction of legal principles. By reason of this the courts are always reluctant to overrule or reverse a decision when title to real property will be involved. Therefore, when a court of last resort has announced principles affecting the acquisition of title to real property, and the principles thus announced have become established and have been frequently recognized and conformed to, and property rights have been acquired thereunder, it has generally been held that the decisions should not be overturned save by the interposition of the legislative power, even though the principles announced therein might otherwise be questioned.”
 

 Sutherland, in his work on Statutory Construction (2d Ed.) Vol. 2, § 485, p. 906, says:
 

 
 *867
 
 “A judicial construction of a statute becomes a part of it, and as to rights which accrue afterwards it should be adhered to for the protection of those rights. To divest them by a change of the construction is to legislate retroactively. The constitutional barrier to legislation impairing the obligation of contracts applies also to decisions altering the law as previously expounded so as to affect the obligations of existing contracts made on the faith of the earlier adjudications. ‘The sound and true rule is/ says Taney, C. J. [in Ohio Life Insurance & Trust Company v. Debolt, 16 How. 416, 432, 14 L.Ed. 997, 1004], ‘that if the contract when made was valid by the laws of the state, as then expounded by all the departments of its government and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the state or decision of its courts altering the construction of the law/ ”