[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 336 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 337 
This suit was instituted by the state of Louisiana to recover $130,378.78 from the Pure Oil Company and the Standard Oil Company of Louisiana, in solido, as the value of seven-eighths of certain oil alleged to have been illegally extracted from lands belonging to plaintiff by the defendant Pure Oil Company, and sold by it to its co-defendant, Standard Oil Company of Louisiana.
The oil in question was produced by three wells drilled on land which had become dry *Page 338 
because of the subsidence of the waters of Ferry Lake in Caddo parish. Plaintiff claims to be the owner of the land by virtue of its inherent sovereignty over the bed of the lake, a navigable body of water at the date Louisiana was admitted into the Union.
The defendant Pure Oil Company concedes that the property was at one time owned by plaintiff. It contends, however, that plaintiff had parted with its title to the Caddo levee board, and that said board, under the authority of Act 268 of 1908, had leased the land to it. In the alternative, this defendant sets up that if the land in question was not embraced in its lease from the levee board, the title thereof is in the levee board and not in the state, and that only the former may sue and not the plaintiff.
The board of commissioners of the Caddo levee district intervened in the suit, and adopted, substantially, the answer of the Pure Oil Company. The intervener specially averred that the land was included in its lease to that company, and it prayed for the enforcement of its rights as lessor. In the alternative, it asked, in the event the court should hold that the property was not covered by the lease, that an accounting be made of the oil produced.
The court below rejected plaintiff's demands. It sustained the prayer of the intervener for the recognition of its lease with the Pure Oil Company, but nonsuited its demands for a supplement of the price and for one-eighth royalty on the oil produced. Intervener's alternative claim for the value of seven-eighths of the oil was rejected. From this judgment both plaintiff and the intervener appeal.
The Caddo levee board was created by act 74 of 1892. Under the statute, the western boundary of the levee district was established on the line dividing ranges 15 and 16 west. By Act 160 of 1900 range 16 was included in the district, carrying its western boundary to the Texas line. *Page 339 
On July 6, 1901, pursuant to section 2 of Act 160 of 1900, the state auditor and the register of the state land office certified to the Caddo levee board approximately 14,959 acres of what was commonly known and classed as "dried-up lake lands." Among the lands so certified was the fractional west half of southwest quarter of section 3 and the east half of southeast quarter of section 4, township 20, range 16 west.
On October 10, 1910, the Caddo levee board executed a mineral lease to the Pure Oil Producing Company covering the following described property, viz.:
 "All that portion of the east half of southeast quarter of section 4 and all that portion of west half of southwest quarter of section 3, township 20 north, range 16 west, not heretofore leased by the board to C.W. Lane, on the _____ day of _____, 1910, which lies in the shores or bed of Ferry Lake or Jeems bayou, the said lands being more specially described as all that portion of the west half of southwest quarter of section 3 not heretofore leased as aforesaid; and all that portion of the east half of the southeast quarter of section 4, township 20 north, range 16 west, Caddo parish, La., lying below the banks of Ferry Lake or Jeems bayou in ordinary stage of high water; being all of the lands owned by the said board in the subdivision aforesaid."
The instrument contained a declaration as to the validity of the title of the levee board and of the state, stipulated for the warranty of the title, with an agreement to refund the purchase price in the event of the lessee's eviction, and set forth the terms and conditions upon which the property was leased. In the contract it was specially provided as follows, viz.:
 "It having been agreed between the said levee board on the one part, and the Pure Oil Producing Company on the other, that a survey should be made of the premises herein leased by a surveyor to be agreed upon by both parties, which surveyor has been agreed upon, and that the said oil company shall pay at the rate of $100 per acre for such acreage as may be shown by the said survey."
At the execution of the lease, the lessee paid the lessor $4,000, at the rate of $100 per *Page 340 
acre, and it was agreed that should the survey show an acreage in excess of 40 acres, the lessee should, within a stipulated time, pay $100 per acre for the excess, and should the survey show an acreage less than 40 acres, the lessor should within a stipulated time return $100 per acre for the deficiency. It was also agreed that if oil in paying quantities was discovered the lessee should have the right to retain out of the royalty oil a sum equal to $40 per acre for the total acreage leased as shown by the survey.
On October 24, 1910, the levee board and the oil company executed the following instrument in the form of an authentic act, viz.:
 "Whereas, on the 10th day of October, 1910, the board of commissioners of the Caddo levee district accepted the proposition of the Pure Oil Producing Company to lease lands in sections 3 and 4 of township 20 north, range 16 west, Caddo parish, La., owned by the said board, the acreage thereof to be determined by survey to be approved by the board; and
"Whereas, the said survey has been made and returned showing an acreage of 50.992 acres of land embraced in the said lease as belonging to the board; and
"Whereas, on the 20th day of October, 1910, the said board by resolution formerly authorized the president of said board to execute such an agreement as is necessary to make the said survey part of the lease and to identify it therewith:
 "Now, therefore, be it known that we, W.V. Robson, as president of the said board, and S.L. Cronin, as the duly authorized agent of the said Oil Company, do hereby declare that the land embraced in the said lease is the land shown by the survey in heavy white lines on the blue print hereto attached and made by H.E. Barnes, civil engineer, and identified herewith by the signatures of the said Robson and the said Cronin; and that all of the land embraced within the said heavy lines was intended to be leased in the said instrument referred to, and is hereby leased under the terms and conditions as set out in the said instrument, whether the same are described in the said instrument or not; and the said plat is declared a part of said lease."
Within the time stipulated in the original lease, the lessee paid the lessor for the excess of 10.992 acres as shown by the survey. *Page 341 
On April 2, 1910, Miss L. Hanzen, S.W. Mason, D.P. Eubank, R.L. Stringfellow, and H.E. Barnes, having complied with the laws relating to the location of lands containing petroleum or other mineral oils under placer mining claims, gave notice that they had located, caused a survey to be made, and had taken possession of 87.09 acres of land described as lying in sections 3 and 4, township 20 north, range 16 west, in Caddo parish, La. On April 27, 1910, they leased these lands to E.H. Jennings, who, on January 6, 1911, assigned the lease to the Pure Oil Operating Company.
It appears, therefore, that the Pure Oil Producing Company held a lease on property apparently belonging to the Caddo levee board, and the Pure Oil Operating Company held a lease on property ostensibly belonging to Miss Hanzen and her associates. Subsequently both companies were absorbed by the Pure Oil Company, one of the defendants in this case.
In 1917, the United States government instituted suit in the District Court for the Western District of Louisiana against Miss Hanzen, her four associates, the Pure Oil Operating Company, and three other defendants for the annulment of the Hanzen mineral location and the mineral lease so far as they extended above 173.09 feet mean Gulf level, and for an accounting of the oil taken from said property. On August 4, 1919, judgment was rendered in favor of the plaintiff, decreeing lot 3 of section 3 and lots 3, 4, and 5 of section 4, township 20 north, range 16 west, containing 37.79 acres, to be the property of the United States and annulling the mineral location and the lease of said property. This judgment was affirmed by the Supreme Court of the United States. See Mason v. United States, 260 U.S. 545, 43 S. Ct. 200, 67 L. Ed. 396.
The wells, known, respectively, as Hanzen Nos. 2, 3, and 4, which produced the oil in dispute, were found to be on that part of the Hanzen mineral location below the 173.09 *Page 342 
contour line, and hence outside the limits of the high land claimed by the United States. The title to this strip of land, which was in the bed of the lake, was, necessarily, vested in the state of Louisiana by virtue of its sovereignty, and the property belongs to the state unless it has parted with its title by virtue of the certification of the state auditor and the register of the state land office to the Caddo levee board.
In the meantime, in April, 1919, the state of Louisiana sued the levee board for the recovery of that portion of the bed of Ferry Lake which had been leased to the Gulf Refining Company of Louisiana, and by an agreed enlargement of the pleadings the land in dispute here was included in that litigation. The suit was only partly tried in the district court of Caddo parish, where it was instituted, when it was settled by a compromise agreement which was reduced to writing and incorporated in a judgment rendered and signed by the district judge on November 14, 1921.
The Standard Oil Company of Louisiana, because of the uncertainty of the title, refused to pay for the oil produced on the land in dispute unless the Pure Oil Company would furnish an indemnity bond to protect it against any adverse claim of title to the land. The Pure Oil Company declined to furnish such bond, and brought suit in the United States District Court for the Western District of Louisiana for the value of the oil delivered to the Standard Oil Company and which had not been previously paid for. The state of Louisiana intervened in this suit, but its intervention was dismissed for lack of jurisdiction. The court held, however, that a sufficient showing had been made of an adverse title in the state to justify the withholding by the Standard Oil Company of payment for the oil until the state's claim of title had been settled. Later, the present suit was filed in the First district court of the parish of Caddo.
Plaintiff contends that the bed and shores *Page 343 
of Ferry Lake were certified, in error, to the board; that the lake bed and shores were in no sense lands within the purview of the statutes creating the levee board; that the certification of said lands was ultra vires and void; and that its nullity was recognized by the levee board and declared by the court in the judgment rendered and signed on November 14, 1921, hereinbefore referred to. The Pure Oil Company and the levee board contend that their lease contract included this land and the said judgment recognized their agreement. We are unable to agree with this contention. Our conclusion is that the lease of October 10, 1910, as supplemented by the notarial agreement of October 24, 1910, did not cover the strip of land in dispute here.
Manifestly, because of prior leases by the levee board, the parties were uncertain as to the extent of the unleased property owned by the lessor, and they therefore stipulated "that a survey should be made of the premises herein leased, by a surveyor to be agreed upon," etc. Mr. H.E. Barnes was agreed upon as the surveyor. He surveyed the land and made a plat thereof. This map or plat, which fully described the land embraced within the lease, was approved by both the oil company and the levee board and was attached to their supplementary agreement executed in notarial form on October 24, 1910, in which instrument "the said plat is declared a part of said lease."
It appears from the record that the same surveyor had previously surveyed the lands covered by the Hanzen mineral location. The south and west traverse line of his survey of the levee board lands coincided with the north and east traverse line of his survey of the Hanzen lands. The strip of property from which the oil in dispute here was produced is embraced within the survey of the Hanzen lands and not within the survey of the levee board lands.
On April 27, 1910, Miss Hanzen and her associates leased their property to E.H. *Page 344 
Jennings, who, on January 6, 1911, assigned his lease to the Pure Oil Operating Company.
It is clear that the parties contracted with reference to the survey which definitely established the boundaries of the leased premises. Having reduced their agreement to writing, and there being no ambiguity or uncertainty as to the nature, object, and the extent of the agreement, it must be presumed that the written document expresses the true and complete undertaking of the parties. Moreover, it is certain that the defendant Pure Oil Company was not misled either as to the terms or the extent of its lease contract with the levee board. Under that lease it went into possession of the property described in the plat attached thereto. It paid for, and its lessor received payment for, only the land shown on that map. It could not have intended to lease, and did not as a matter of fact lease, from the levee board the property on which it drilled the wells known as Hanzen's 2, 3, and 4, because that property was at the time under lease to Jennings whose rights it acquired within a few months after the execution of the lease with the levee board. The belief of all parties at the time these transactions were entered into was, evidently, that the title of the lands subject to the Hanzen lease had been originally in the federal government, and that neither the state nor the levee board had any interest therein. The Pure Oil Company had prepared and executed division orders in which it authorized the Standard Oil Company to pay the royalty on oil received from the Hanzen wells to Miss Hanzen and her associates. The levee board never received nor claimed any royalty except for the oil produced by the wells drilled on the lands embraced within its leases of October 10 and 24, 1910. The lands and leases thereon were held in this manner, and these dealings among, and this course of conduct of, all the interested parties persisted, for approximately 15 years. In fact, it was not until the present suit was instituted *Page 345 
the Pure Oil Company came to the conclusion, apparently, that the land which it held under the Hanzen lease was included in its lease from the levee board, when it offered for the first time to pay the said board for the increased acreage and a royalty on the production of the wells. This it could well afford to do, if by so doing it could defeat plaintiff's suit.
Since we have found that the land on which the Hanzen wells 2, 3, and 4 were not embraced with the terms of the lease from the levee board to the Pure Oil Company, the further question presented for decision is whether the land belonged to the levee board at the time the oil was extracted, thereby precluding any right of recovery for its value on the part of the state.
The question finds its answer in the admission by the parties and the judgment rendered and signed in pursuance thereof in the case of the present plaintiff against the Caddo levee board and the Gulf Refining Company, referred to supra. In that judgment the title of the state to the lands is recognized and the act of certification thereof dated July 6, 1901, from the state auditor and the register of the state land office is annulled. The judgment was not appealed from and is now final. It is therefore the law of the case. It concludes the levee board, and the Pure Oil Company, although not a party to the litigation, cannot champion the cause of the levee board, nor assert any rights under the reservations recited in the judgment, since its lease from that board did not include the land in controversy here. The judgment, in effect, decrees that the land was never embraced within the levee district and was always owned by the state. Furthermore, the certification by the register of the land office and the auditor to the levee board merely placed the property under the control of the levee board as a state agency for the constructing and maintaining of levees. The lands to all practical intents and purposes were always the property of the *Page 346 
state. State v. Grace, 161 La. 1039, 109 So. 830. In these circumstances, it is the state, and not the levee board, which has a right of action against the Pure Oil Company for the recovery of damages for its trespass upon lands owned by the state.
The Pure Oil Company, in its answer, prays that, in the event of a recovery by plaintiff, there be deducted from the value of all oil for which said defendant may be held liable the total cost to defendant and to the companies through which it holds of producing and marketing the oil. We think they are entitled to this relief. Rosenthal-Brown Fur Co., Inc., v. Jones-Frere Fur Co. et al. (Nos. 26965, 27050, 27510 of our docket) 162 La. 403,110 So. 630. However, in our examination of the record, we failed to find any basis on which such allowance can be made. It is necessary therefore to remand the case in order to ascertain the amount of the credit to be given to said defendant for the costs and expenses incurred in producing and marketing the oil.
The Standard Oil Company called its codefendant, the Pure Oil Company, in warranty, praying that, in the event judgment for any amount be rendered against it in favor of plaintiff, it have judgment against its warrantor for a like amount.
The Pure Oil Company has admitted that it is bound in warranty to the Standard Oil Company of Louisiana, and has filed a stipulation in this court in which it has agreed that:
 "If any judgment is ordered or decreed in favor of the plaintiff, the state of Louisiana, against the Standard Oil Company of Louisiana, defendant, the said defendant is in that event entitled to have judgment ordered or decreed in its favor in warranty against its codefendant, the Pure Oil Company."
For the reasons assigned, the judgment appealed from is set aside, and it is now ordered that there be judgment in favor of the state of Louisiana, plaintiff herein, and against the Pure Oil Company and the Standard *Page 347 
Oil company of Louisiana, defendants herein, in solido, in the full sum of $130,378.78, with legal interest on $56,157.21, thereof from June 30, 1921, until paid, and upon $74,221.57 thereof from September 30, 1914, until paid, and all costs of suit. It is further ordered that said judgment be subject to a credit in favor of the defendants of an amount equal to seven-eighths of the costs and expenses incurred in producing and marketing the oil in question, and that this case be remanded to the district court solely for the purpose of ascertaining and determining the amount to be so credited on the judgment. It is further ordered that there be judgment in warranty in favor of the Standard Oil Company of Louisiana against its codefendant, the Pure Oil Company, for the full amount for which it is herein condemned in solido with its said codefendant. It is further ordered that the intervention of the board of commissioners of the Caddo levee district be dismissed at its cost.
O'NIELL, C.J., and LAND and BRUNOT, JJ., dissent.
 On Motion to Vacate Judgment.