17 So.2d 569

**STATE v. TEXAS CO. et al.**

No. 37155.

March 13, 1944.

Eugene Stanley, Atty. Gen., and Edward L. Gladney, Jr., Sp. Asst. Atty. Gen., for appellant.

C. H. Blish and Milling, Godchaux, Saal & Milling, all of New Orleans, for appellees.

HAMITER, Justice.

The State of Louisiana is appealing from a judgment that dismissed its suit following the court's sustaining of exceptions of no right of action and no cause of action interposed by defendants, the Texas Company and Carroll S. Mayer.

Through the proceeding the state purposes to obtain the annulment of an amendatory instrument, executed on November 17, 1928, by the then Governor, to the extent that it purported to amend State Lease No. 214 dated September 13, 1928, so as to include in that lease all of the beds or bottoms of navigable waters in the area of the game and fish preserve and public hunting grounds created by Act No. 52 of Ex. Sess. 1921. Further the state seeks to recover from the Texas Company possession of those water bottoms, together with seven-eighths of the oil produced therefrom during the past several years.

Previously the action was before us on exceptions which questioned the authority of the attorney general and his special assistants to institute and prosecute it on behalf of the state. The exceptions were overruled and the case was remanded for further proceedings. 199 La. 846, 7 So.2d 161.

By Act No. 30 of Ex.Sess.1915, as amended by Act No. 315 of 1926, the Governor was "authorized to lease any lands, including lake and river beds and other bottoms, belonging to the State of Louisiana, for the development and production of oil * * *", the leasing to follow competitive bidding; and he was "vested with full authority to execute any lease or leases so granted, to the highest bidders therefor, under such terms and conditions as to him seem proper.

At the Extra Session of the Legislature in 1921 there was created, through the adoption of Act 52, the above mentioned game and fish preserve and public hunting grounds by the setting apart of certain state lands.

One F. F. Nigh on July 31, 1928, so the state's petition alleges, made application in writing for the acquiring of a mineral lease on the following described property: "All the land belonging to the State within the game preserve and public hunting grounds created by Act 52 of 1921 [Ex. Sess.] *and described therein*, amounting to approximately 60,000 acres." Whereupon

the Governor, as required by Act 30, Ex. Sess. of 1915, as amended, advertised for bids on the mineral lease, the advertisement containing the identical description used in Nigh's application.

On September 4, 1928, the bids were opened, and the one tendered by Carroll S. Mayer, for a lease on lands described in Nigh's application and in the advertisement, was accepted. In keeping with the acceptance, the Governor executed under date of September 13, 1928, a written instrument, designated as Lease No. 214, leasing on behalf of the State of Louisiana to Carroll S. Mayer the property specifically and particularly described in Act 52 of 1921 Ex.Sess. as being all swamps and marsh lands in certain sections, townships and ranges.

Lease No. 214, just described, is in no manner attacked or questioned by the state in this action. It is recognized to be valid and binding in all respects. The instrument sought to be annulled herein is the amendatory act executed by the Governor on November 17, 1928. This amendment, purporting to reform and clarify the description contained in Lease No. 214, provides, insofar as is here pertinent, as follows:

"Whereas, in the execution and delivery of said lease to the said Carroll S. Mayer, lessee, said lands were more particularly described in the manner set out in said Act No. 52 of the Acts of the Louisiana Legislature for the year 1921; and

"Whereas, it was the intention at the time of the advertisement of said lands for lease and at the time of accepting bids thereon that the said State of Louisiana had offered

and was leasing all of the lands owned by it *within the limits of said description, including the beds of all streams, lakes, rivers and other bottoms belonging to the State of Louisiana and included within the limits of said preserve,* as described in said Act No. 52 of the Acts of the Louisiana Legislature for the year 1921; that the officers of the State of Louisiana, in authorizing said lands to be advertised for lease and in so leasing said lands and accepting bids thereon understood and intended that said lease proposed to be granted by the State of Louisiana should cover and include *all of such beds and bottoms of rivers, streams and lakes,* and that the said Carroll S. Mayer, lessee, under said lease of date September 13, 1928, so understood said lease and the amount of his bid was based upon said understanding;

\* \* \* \* \* \* \*

"Now, therefore, the said Huey P. Long Governor of the State of Louisiana, acting under the authority of said Act No. 30 of the Extra Session of 1915, as amended by Act No. 315 of the Acts of the Louisiana Legislature for the year 1926, and in further response to the advertisements of the proposed leasing of the lands hereinabove referred to and to the bids received at the State Capital on the 4th day of September, 1928, whereat it appeared that the bid of the said Carroll S. Mayer was the most advantageous, and the said Carroll S. Mayer, lessee in said lease of date September 13, 1928, hereinbefore referred to and described, do by these presents clarify and reform the description of property described in said lease *so as to include therein, by specific wording, all of the beds of the riv-*

*ers, streams, lakes, bayous and bottoms, navigable, and non-navigable, owned by the State of Louisiana within the limits of the preserve establish*ed by Act No. 52 of the Acts of the Louisiana Legislature for the year 1921, * * *." (Italics ours.)

On December 4, 1928, Carroll S. Mayer made an assignment to the Texas Company of all of his rights under the lease and the amendment. The assignment, on the following day, was approved by the Governor.

Thereafter the assignee drilled nine wells in such disputed beds of navigable waters, from which it has produced and is now producing oil in paying quantities; and to the state it has paid royalties of one-eighth, provided for under the lease, and also all severance taxes.

On June 16, 1939, the then Attorney General of Louisiana wrote to the Texas Company asserting that the purported amendment was invalid insofar as it sought to include within the leased property the bottoms of any navigable waters. Further, he declared in his letter that the above mentioned nine wells, along with all production therefrom, belonged to the State of Louisiana.

The institution of this suit followed on June 28, 1939.

The exceptions of no right of action, to quote from the brief of defense counsel, are "predicated upon the proposition that this action is one instituted by the State having for its object the annulment of a state mineral lease; that under the laws of this State no such action may be institut-ed by the State, but only by the State Mineral Board, for the reason that the Legislature, in creating that Board, vested it with complete authority to institute such actions, and therefore the State has relinquished the right to prosecute an action to annul a state mineral lease."

■ The leasing of state lands for mineral or other purposes is within the exclusive province of the Legislature. Section 2 Article 4 of the Constitution of 1921; State ex rel. Brenner v. Noe, Governor, et al., 186 La. 102, 171 So. 708. By Act 30 of Ex.Sess. 1915, as amended by Act 315 of 1926, the Legislature constituted the Governor its agent for the execution of mineral leases on lands of the state and prescribed certain conditions to be followed. Later, under Act 9 of Ex.Sess. 1928, the Register of the State Land Office and the Governor were designated as the representatives of the state in the interpretation of its mineral leases.

The mentioned agency for the execution of the leases, however, was revoked and changed through the enactment of Act 93 of 1936. The Legislature, by that statute, created the State Mineral Board as a body corporate with the usual powers incident to corporations, including those of suing and being sued, Section 1; and it vested the board with full authority to lease state lands, including "lake and river beds and other bottoms", for mineral development and production, Section 4. Further, the Legislature declared, in Section 9 of the statute, that:

"The Board shall have full supervision of all mineral leases granted by the State,

now in effect or hereafter entered into, in order that it may determine that the terms of any such lease are fully complied with, and generally shall have authority to take any lawful action for the protection of the interests of the State. It shall have authority to institute any action to annul any such lease upon any legal ground whatsoever."

And it provided in Section 12:

"The Attorney General shall be the attorney for the Board, but the Board shall have the authority to employ * * * counsel in special matters."

Predicated on that statute is the contention of defendants that the State Mineral Board has been given the exclusive authority to institute suits for the annulment of mineral leases, and that the state is now without any right. In this connection they argue: "The settled rule in this state is that where the Legislature has authorized the institution of a suit by a board and has vested that board with jurisdiction of the particular matter at issue, no suit with respect to such matter may be instituted in the name of the state."

Unquestionably before the passage of Act 93 of 1936 there existed in the state the right to sue or be sued in its own name on matters pertaining to its mineral interests; all suits of that nature then were in the name of the state proper, whether as plaintiff or defendant. The statute, as we appreciate and interpret it, has not divested the sovereign of such right. It is true that the created State Mineral Board was thereby vested with authority to lease any state lands; that it was given full supervision of all mineral leases awarded by the state;

and that it was granted the power to institute actions to annul any such lease. But these conferred authorizations were not declared by the Legislature to be exclusive. Neither has the state transferred to the board title to its lands and mineral rights.

The State Mineral Board, by the statute, has been designated merely the agent of the state to supervise and handle that portion of its affairs which deals with the development of its lands for mineral purposes, and to this end the agent is permitted the right, concurrently with the principal (state), to institute actions in nullity. The board may be likened to an agent of an individual property owner who (agent) has been granted full, but not exclusive, authority in the management and supervision of the owner's holdings, with power to bring suits respecting the property. In such case certainly the owner has not precluded himself to institute all necessary actions.

Cited by defendants in support of their position are numerous decisions of this court and other courts. None is exactly in point, but by analogy all are sought to be applied to the present situation. We shall discuss them briefly.

Clearly inapplicable are State v. Tensas Delta Land Company, 126 La. 59, 52 So. 216, State v. Standard Oil Company of Louisiana, 164 La. 334, 113 So. 867, Board of Commissioners of Tensas Basin Levee District v. Hardtner, 164 La. 632, 114 So. 494, and United States of America ex rel. State of Louisiana v. Jack, 244 U.S. 397, 37 S.Ct. 605, 61 L.Ed. 1222. In those cases the Legislature had vested the absolute title to the lands in controversy in the Levee Boards,

and such political agency alone had the right to bring suit for the recovery of the property; institution of the actions in the name of the state was declared unauthorized. Here the title of the state has not been transferred to its agent, the State Mineral Board.

Counsel for defendants assert that in Board of Commissioners of Port of New Orleans v. Toyo Kisen Kaisha, 163 La. 865, 113 So. 127, the court held that the board, to quote from their brief, "was vested with the right of action; was the proper party to institute the action; and that prescription ran against it because the suit was not one by the state but by it, a distinct separate entity." We do not understand the case to hold that the state had no right to sue on the cause of action; rather the court only said that it was the well settled jurisprudence that the exemption from the running of prescription "has very generally been confined to actions brought by and in the name of the state itself." The question of whether the cause of action belonged to the state or the board was not made an issue or decided therein.

Saint, Attorney General, et al. v. Allen, len, et al., 172 La. 350, 134 So. 246, is strongly relied on by defendants. It merely holds that the highway commission possessed the implied power, under the legislation by which that agency was created, to employ attorneys at law to attend to its legal business and was not required to avail itself of the services of the Attorney General.

Also cited are the cases of Drummond v. Commissioners of Clinton & Port Hudson Railroad Co., 7 Rob. 234; Seibert v. Conservation Commission of Louisiana et al., 181 La. 237, 159 So. 375; Barnett v. State Mineral Board, 193 La. 1055, 192 So. 701; Reeves v. Leche, Governor, et al., 194 La. 1070, 195 So. 542. These are authority for the undisputed proposition that an agency designated by the Legislature to administer state property, with power to sue and be sued, may stand in judgment as the agency of the state. In the present controversy the State Mineral Board, by reason of the statute creating it, has the right to sue, and any judgment rendered by the courts in the suit would be binding on the state; but from this it does not necessarily follow that only the board can bring the action.

Since the Legislature has granted to the State Mineral Board only the concurrent, not the exclusive, power to sue for the nullity of mineral leases, the state is authorized to maintain this action in its name.

For a cause of action the state alleges generally that the assailed amendatory instrument purports to include in the leased lands the bottoms of all navigable waters lying within the area or limits of the game and fish preserve; that these bottoms were not covered by the application, advertisement and bids relating to the granting of the lease, and, consequently, were not leased; and that the execution of the amendment was in effect the awarding of a mineral lease on state property without the competitive bidding that the law requires.

In presenting the exceptions of no cause of action, defendants take the position, to again quote from the brief of their counsel,

that "the petition filed by the plaintiff and the exhibits thereto attached, which include the State Mineral Lease No. 214 and the amendment, clearly disclose that the Governor advertised for a bid for a mineral lease covering the water bottoms in question in this suit; that a bid was submitted and accepted and that the mineral lease, with the amendment, merely complied with the advertisement and the bid; that this mineral lease was assigned to the Texas Company by a written instrument of assignment, approved by the Governor, and the Texas Company developed the water bottoms under the lease and produced oil therefrom and paid the royalty to the State."

█ To lease state lands for mineral purposes, under the authority of Act No. 30 of Ex.Sess. 1915, as amended, the Governor was required to advertise for bids and to place in the advertisement a description of the lands to be leased. State ex rel. Brenner v. Noe, Governor, et al., supra. Hence that official, regardless of his intention, could execute a valid lease only on the property described in the advertisement.

The lands advertised in the instant case were: "All the land belonging to the state within the game preserve and public hunting grounds created by Act 52 of 1921, Ex. Sess., *and described therein*, amounting to approximately 60,000 acres". From this advertisement it appears that the lands offered for leasing were those described in Act 52 of 1921, Ex.Sess.; therefore, to determine whether or not the disputed bottoms of navigable waters were properly included in the lease it is necessary to consider the provisions of that statute.

Section 1 of the Act commences: "Be it enacted by the Legislature of Louisiana, That all of the vacant and unappropriated public lands belonging to the State of Louisiana, now existing or hereafter acquired by accretion or otherwise, and more particularly described as follows * * *"; it continues with numerous specific descriptions of the property, these being by sections, townships and ranges, each of which begins with the phrase "all swamps and marsh lands in", and each declares the land to be either east or west of the Mississippi River; and Section 1 concludes with the words "be and the same are hereby withheld and withdrawn from entry or sale and are hereby perpetually dedicated as a game preserve and public hunting ground."

Section 2 gives the Department of Conservation absolute control concerning the use of the lands, and Section 3 makes unlawful any trapping, fishing or hunting on the preserve except under the regulations and rules of that agency.

This statute contains no expressed declaration that the navigable waters within the mentioned large area, the beds of which belong to the state by reason of its sovereignty, are a part of and included in the preserve. But can it be correctly said that the provisions of the Act impliedly provide for their inclusion and that the Legislature intended it?

█ In the interpretation of a statute, words of general import are limited by words of restricted meaning which immediately follow them and relate to the same subject. Mixon v. St. Paul Fire & Marine Insurance Co. of St. Paul, Minn., 147 La.

302, 84 So. 790; 59 C.J., verbo Statutes, § 580. Following the general language of "all of the vacant and unappropriated public lands belonging to the State of Louisiana," as used in Section 1 of the 1921 Act, are such restrictive words as "more particularly described as follows", and "all swamps and marsh lands." Also following are specific land descriptions, they being by sections, townships and ranges. Clearly these restrictive provisions, which follow the general word "lands", do not indicate an intention to include the bottoms of navigable waters. To the contrary they show that only the property specifically described was to constitute the preserve.

■■ The assumption is that all parts of a statute—each word, each phrase, each clause—were intended by the Legislature to have some meaning; none was inserted by mere inadvertence. Furthermore, all of the statutory provisions are to be given effect wherever possible. With this in mind, we observe that the Legislature in Section 1 of the Act of 1921, after referring to all vacant and unappropriated public lands of the state, used the words "now existing or hereafter *acquired by accretion* or otherwise." This reference to acquisition by accretion is of much significance. If the intention had been, as defendants contend, that the preserve should be composed of all lands within its general area, including water bottoms, there would have been no reason for the specific inclusion of accretive land. The preserve, if all embracing, naturally would contain that property. The clause "acquired by accretion" can be given a definite meaning and made to function; but to adopt the construction of the stat-ute for which defendants contend would render that clause meaningless and mere surplusage.

Moreover, under defendants' interpretation the preserve would include the waters and the bottoms of that part of the Mississippi River lying within the land area involved. Yet the statute, in particularly describing the swamps and marsh lands affected, states specifically that the respective tracts are either east or west of the Mississippi River.

It is interesting to notice that by Act 30 of Ex.Sess. 1915 the Legislature intended that the Governor have authority to lease water bottoms and its intention was clearly and expressly manifested therein. That statute did not merely state that the Governor is authorized to lease all state lands; it declared that "the Governor be and is hereby authorized to lease any lands, including lake and river beds and other bottoms, belonging to the State of Louisiana." But, as before shown, the 1921 Act makes no reference to water bottoms; rather it seems to have excluded them by the use of words of significant and special meaning.

In the recent case of D'Asaro et al. v. State of Louisiana, 204 La. 974, 16 So.2d 538, 540, we considered Act 52 of 1921, Ex. Sess., and its application to the lease and amendment presently being discussed. Therein we observed:

" * * * It is obvious, therefore, that the conclusion of the plaintiffs that their land was included in these leases is not well founded, for the state in its leases *not only limited the property affected thereby to the swamp and marsh lands belonging to it;* but

the plaintiffs, in describing the property claimed by them have failed to allege and show that it falls into the category of swamp and marsh lands, the type of land affected by the leases. * * *" (Italics ours.)

Based upon what we have said above, therefore, our opinion is that the state has alleged a cause of action and that the case should be tried on its merits.

Tending to support that opinion also, but not necessarily serving as a basis for it, is an assertion in the brief of counsel for the state that the attacked amendatory instrument extends the original lease No. 214 "to include an additional approximately 125,000 acres of state water bottoms". Of course, no allegation to this effect is made in the petition; however, plaintiff is entitled to amend that pleading so as to make it. Bates v. Prudential Insurance Company of America, 192 La. 1029, 190 So. 120. And if this amending be accomplished, certainly a cause of action would be shown. The asserted appreciable excess (approximately 125,000 acres) over the approximately 60,000 acres recited in the advertisement for the bids would furnish the obvious and inescapable conviction that a leasing of the bottoms of the navigable waters was not intended.

Consideration can not now be given to the argument of defense counsel, made orally and in their brief, that the state is estopped to contest a contract under which it has accepted benefits. No plea of estoppel has as yet been filed or urged herein.

For the reasons assigned, the judgment of the district court is reversed and set

aside, the exceptions of no right of action and no cause of action are overruled, and the case is remanded for further proceedings according to law. Costs of this appeal shall be paid by defendants; all other costs are to abide the final determination of the case.

O'NIELL, C. J., absent during the argument.